884 P.2d 392

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Lian–Wen CHEN, Defendant–Appellant.**

**No. 16374.**

Intermediate Court of Appeals of Hawai'i.

Oct. 25, 1994.

Order Granting in Part and
Denying in Part Reconsideration and
Modifying Opinion in Part Nov. 10, 1994.

Certiorari Denied Nov. 28, 1994.

Daphne E. Barbee, on the briefs, Honolulu, for defendant-appellant.

Doraine F. Meyer, Deputy Pros. Atty., City and County of Honolulu, on the brief, Honolulu, for plaintiff-appellee.

Daphne E. Barbee, on the motion for reconsideration, Honolulu, for defendant-appellant.

Before BURNS, C.J., and HEEN and ACOBA, JJ.

ACOBA, Judge.

On July 23, 1991, Defendant–Appellant Lian–Wen Chen (Defendant) was charged in Count I of the subject indictment with failing to stop at the scene of an accident in violation of Hawai'i Revised Statutes (HRS) § 291C-12(a) (1985), and in Count II with negligent homicide in the third degree in violation of HRS § 707–704 (Supp.1992) [1]; all violations were alleged to have taken place on December 20, 1989. Jury trial began on June 22, 1992. Defendant moved for judgment of acquittal at the close of the State's case. The circuit court denied the motion, and Defendant introduced evidence in his defense. On June 26, 1992, the jury returned a verdict of guilty as to Count I and not guilty as to Count II, and was discharged.

On July 9, 1992, Defendant filed a motion for judgment of acquittal as to Count I (motion). The State filed a memorandum in opposition to the motion on July 16, 1992, and the court orally denied the motion on July 24, 1992. The written order denying the motion was filed on August 10, 1992. On July 31, 1992, Defendant was sentenced to probation for five years with special conditions consisting of a $500 fine and 100 hours of community service.

Defendant appeals his conviction under Count I.

We affirm.

■ Preliminarily, it is evident that Defendant failed to file his motion within the time required under the rules. In pertinent part, Hawai'i Rules of Penal Procedure (HRPP) Rule 29(c) states that a motion for judgment of acquittal, after the jury has been discharged, "may be made or renewed within 10 days after the jury is discharged or within such further time as the court may fix during the 10–day period." Including Saturdays and Sundays,[2] the motion was filed thirteen days after the jury returned its verdict, making the motion untimely under HRPP Rule 29(c). The record does not indicate that the trial court fixed any additional time during the ten-day period within which Defendant could file the motion.

The State did not raise the motion's untimely filing in the circuit court. Nor did the circuit court address the motion's untimeliness in its oral or written orders. On appeal, the State again did not object to the untimely filing of the motion.

The Supreme Court of the State of Hawai'i recently addressed the timeliness of a motion for judgment of acquittal in *State v. Reed,* 77 Hawai'i 72, 881 P.2d 1218 (1994). In *Reed,* the defendant filed a motion for judgment of acquittal and a motion for a new trial more than two months after the jury delivered its verdict. Nevertheless, the trial court heard and denied the motions. *Id.* at 83, 881 P.2d at 1229. The court found that the "[trial] court was without authority to waive the time requirements set forth in HRPP [Rule] 29(c) ... and, therefore, was without jurisdiction

---

1. Hawai'i Revised Statutes (HRS) § 707–704 (Supp.1992) provides as follows: "**Negligent homicide in the third degree.** (1) A person is guilty of the offense of negligent homicide in the third degree if that person causes the death of another person by the operation of a vehicle in a manner which is simple negligence."

2. In this respect, Hawai'i Rules of Penal Procedure (HRPP) Rule 45(a) states:
   **(a) Computation.** In computing any period of time the day of the act or event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included unless it is a Saturday, a Sunday, or a holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a holiday. When a period of time prescribed or allowed is less than 10 days, intermediate Saturdays, Sundays and holidays shall be excluded in the computation. As used in these rules, "holiday" includes any day designated as such pursuant to Section 8–1 of Hawai'i Revised Statutes.

to entertain [defendant's] motions for new trial and judgment of acquittal." *Id.* The court thus held that "the trial court's rulings denying [defendant's] motions for new trial and judgment of acquittal are null and void." *Id.* Because Defendant, here, failed to file his motion within the requisite time period, the circuit court lacked jurisdiction to hear it. Accordingly, the circuit court's order denying the motion must be vacated.

■ Defendant's failure to timely file his motion would ordinarily preclude us, on appeal, from considering the grounds raised in his motion. It has been held, however, that where the defendant had previously moved for judgment of acquittal at the end of the government's case and presented evidence on his or her behalf but failed to renew the motion at the close of all the evidence, the grounds raised in the motion may still be considered on appeal to avoid manifest injustice or plain error. *United States v. Alvarado,* 982 F.2d 659 (1st Cir.1992) (clear and gross injustice); *United States v. Teague,* 956 F.2d 1427 (7th Cir.1992) (manifest miscarriage of justice); *United States v. Williams,* 940 F.2d 176 (6th Cir.1991) (manifest miscarriage of justice); *United States v. Pennyman,* 889 F.2d 104 (6th Cir.1989) (plain error); *United States v. Tapia,* 761 F.2d 1488 (11th Cir.1985) (miscarriage of justice). Analogously, Defendant, here, had moved at the close of the State's case for a judgment of acquittal, but his failure to timely file a new motion or to renew the prior motion as to Count I at the end of the case made the subject motion a nullity.

■ Additionally, the failure to file a motion for judgment of acquittal within the time allowed has not precluded a court from reviewing the case on appeal to avoid manifest injustice.[3] *Teague* at 1433. Indeed, "[t]he cases ... are ... many in which convictions

have been reversed though a motion [for judgment of acquittal] was not made, or was not properly renewed, in the trial court." 2 C. Wright, *Federal Practice and Procedure: Criminal* § 469 at 674 (1982). "And quite frequently courts will review the evidence while saying they are not obliged to do so." *Id.* Also, while acknowledging a defendant's failure to file or renew a motion for judgment of acquittal, courts have examined the sufficiency of the evidence although ultimately affirming the convictions. *E.g., United States v. Chu,* 5 F.3d 1244 (9th Cir.1993); *Alvarado; United States v. Pruneda–Gonzalez,* 953 F.2d 190 (5th Cir.1992); *United States v. Sherod,* 960 F.2d 1075 (D.C.Cir. 1992); *United States v. Richard,* 943 F.2d 115 (1st Cir.1991); *Pennyman; United States v. Hernandez,* 876 F.2d 774 (9th Cir. 1989); *United States v. Landers,* 484 F.2d 93 (5th Cir.1973). We believe it appropriate, in this particular case, to determine whether plain error exists, although the motion was not timely made.

Moreover, our consideration of Defendant's motion on appeal would obviate a foreseeable petition under HRPP Rule 40[4] and any subsequent ineffective assistance of counsel claim arising from defense counsel's failure to file a timely motion for judgment of acquittal. Since "the ineffective assistance of counsel [here was] ... so obvious from the record[,] ... a [HRPP] Rule 40 proceeding would serve no purpose except to delay the inevitable and expend resources unnecessarily." *State v. Silva,* 75 Haw. 419, 438–39, 864 P.2d 583, 592 (1993).

We turn, then, to an examination of the evidence adduced at trial. The following facts were stipulated to by the parties:

That on or about December 20, 1989 ... [Defendant] was the driver of a Fort [sic]

---

3. We express no opinion as to the applicability of the manifest injustice standard of review because, as discussed, *infra,* a review for plain error sufficiently addresses the issue here.

4. HRPP Rule 40(h) provides that "[a]ny party may appeal to the supreme court from a judgment entered in the [Rule 40] proceeding in accordance with Rule 4(b) of the Hawai'i Rules of Appellate Procedure."

In addition, HRPP Rule 40(f) provides in relevant part:

If a petition alleges facts that if proven would entitle the petitioner to relief, the court shall grant a hearing which may extend only to the issues raised in the petition or answer. However, the court may deny a hearing if the petitioner's claim is patently frivolous and is without trace of support either in the record or from other evidence submitted by the petitioner.

Mustang [automobile and] ... said Ford Mustang was involved in a collision with ... a Cadillac Sedan de Ville taxi ... driven by Khoe Van Nguyen.... That as a result of being struck by the Cadillac Sedan de Ville taxi driven by Khoe Van Nguyen, [the pedestrian] received serious injuries which were the proximate cause of her death.... [5]

Barbara Kumuhone (Kumuhone), a witness called by the State, first noticed Defendant near the Aloha Tower (in Honolulu, on the island of O'ahu) because he "wasn't paying attention to his driving ... [and] was doing a lot of talking to passengers he had [sic]." Kumuhone was in the only car behind Defendant, who was driving a Ford Mustang (Mustang) in the middle lane of the three lanes on Ala Moana Boulevard. As Defendant approached the intersection at Ala Moana Beach Road near the entrance to Ala Moana Beach Park, the traffic light at the intersection turned "yellow" and Defendant's vehicle slowed down.

Kumuhone was about two car lengths behind Defendant when she saw "the [Mustang] turning slowly on [sic] the right lane" but Defendant did not signal to indicate that he was making the turn. As the Mustang entered the right lane, Kumuhone "looked in [her] side view mirror, and [ ] saw a ... taxi coming on [sic] the right lane." According to Kumuhone, the taxi looked like it was speeding. About a hundred feet from the intersection, the taxi struck the front right and the passenger side of the Mustang.

After the collision with the Mustang, the taxi veered to the right, through the intersection and onto the sidewalk. Officer Edwin

Koga, a traffic accident investigator, testified that the taxi "struck a traffic light pole, ... continued ..., struck [a] fire hydrant and a short stone wall, ... [and] also hit a street light pole[,]" finally resting against a tree. On cross examination, Officer Koga stated that he did not notice any tire marks or skid marks on the roadway. Officers Glenn Kusatsu and Mark Mikami also participated in the investigation of the accident. Both confirmed that they recovered debris from the road consisting of a broken plastic lens cover and part of a hubcap that matched the damage from Defendant's Mustang. Officer Mikami also indicated that he observed damage to the right front portion and the right side of the Mustang.

Kumuhone saw that the impact of the collision moved Defendant's Mustang into the middle lane of the road. While there, Kumuhone noticed that Defendant and his passengers looked at the taxi. She observed the passenger in the back seat of the Mustang make a "forward and back" hand gesture.[6] Kumuhone also saw the taxi on the side of the road and "two legs [of the pedestrian] underneath the vehicle sticking out." [7] After fifteen seconds passed, Defendant drove off and Kumuhone followed Defendant into the Waikīkī area and alerted a police officer who eventually stopped Defendant.

Arresting officer Claire Hagel approached Defendant and asked if he was "involved in an accident" and he replied, "But it wasn't my fault." Officer Hagel observed that "[t]here was an older oriental couple in the car with [Defendant]." She did not see any injuries on Defendant or his passengers, nor did she have any "reason to believe they

---

**5.** The stipulation also stated that Defendant took an intoxilyzer test a few hours after the accident, the results indicated no alcohol in his body, and "that the driver of the ... taxi ... was not arrested or charged with an offense in connection with the accident dated 12–20–1989."

**6.** In Defendant's oral motion for judgment of acquittal made after the State rested, he argued that this hand gesture indicated that the passenger waved him to drive on after the collision, and acquittal on Count I should be granted on this basis.

**7.** Kumuhone testified that she did not see the collision between the taxi and the pedestrian.

During his testimony, Officer Koga did not indicate when the taxi struck the pedestrian. The location of the pedestrian prior to being struck by the taxi was never clearly established. Kumuhone, during her cross-examination, testified that she initially told the police officer that the person hit by the taxi was a jogger, then she later changed her statement and told the police that the victim was a pedestrian. She changed her statement because she "felt that anyone that was standing there was a pedestrian waiting to cross the street, whether it was a jogger or anyone." From Kumuhone's testimony, we infer that the pedestrian was on the sidewalk prior to the collision with the taxi.

needed any" medical assistance. She noted that Defendant "was speaking English ... [but] he only said a few words" and appeared to understand her instructions.

Officer Calvin Tong assisted Officer Hagel and he recalled that Defendant "calmly" asked him, "Excuse me, Officer, how is the lady that was hit? Is she okay, the lady that was hit by the other car?"

Defendant testified that on the morning of the accident he had just picked up his parents, who were visiting from Taiwan, from the airport. According to Defendant, he did not see the vehicle that struck his Mustang, nor did he cross over to the right lane of the road. He claimed he was still in the center lane when he was struck by the other vehicle. Defendant continued to drive after being hit because he was concerned for his "parents' safety"[8] and he did not know that the other car hit a pedestrian. Defendant drove towards his apartment to look for one of his roommates to help him get his parents to the hospital, because he did not know the location of the nearest hospital and his roommates spoke English better than he did. Defendant did not get his parents to the hospital until the following morning because he was detained by the police and his parents were tired from their trip. At the hospital, his father's right leg was bandaged and his mother was examined but was not treated for any injuries. On cross-examination, Defendant testified that he learned that a woman was killed in the accident when he overheard officers talking about it after he was stopped. He admitted he knew he had been in an "accident," and that as a result, he was required to stop.

Defendant called an "accident reconstructionist" as an expert witness. The expert estimated the taxi's speed at impact with the

Mustang to be about forty-four to forty-eight miles per hour, while the Mustang's speed was approximately twenty miles per hour.[9] Hence, the expert believed "the momentum and velocity of the taxi would have carried it basically straight down the roadway" after its impact with the slower Mustang. Instead, the taxi veered to the right. This suggested to the expert that "to get it over to where it went, the taxi driver had to make an input to the vehicle[,] ... a turn to the right."[10] In conclusion, the expert opined that the impact between the taxi and the pedestrian was caused by "the speed of the taxi[,] ... the failure of the taxi to do any type of braking from [sic] observing the light turning yellow or the drifting of the Mustang," and the driver turning the taxi to the right after the impact with the Mustang.

From what we can determine, Defendant raises two points on appeal. First, he argues that the court erred in denying his motion for judgment of acquittal based on three grounds: (a) Defendant was not involved in the accident because he "was not the driver of a vehicle which struck a pedestrian;" (b) Defendant's collision with the taxi was a separate accident from the incident involving the taxi and the pedestrian; and (c) the not guilty verdict on Count II (negligent homicide) was inconsistent with the guilty verdict on Count I (failing to stop at an accident). While Defendant's motion was not timely filed as we indicated previously, we treat it as if it had been, for purposes of our analysis. Second, Defendant contends that the evidence was insufficient to sustain the guilty verdict.

## I.

We address, then, the specific arguments raised in Defendant's motion.

> The estimate of the Mustang's speed is supported by testimony from Kumuhone who testified that she slowed down because the traffic light turned "yellow" and she was travelling at about twenty miles per hour behind the Mustang.

**8.** Pursuant to Defendant's request, the trial court instructed the jury on the "choice of evils" defense as to Count I based on Defendant's claim that he left the accident site to tend to his parents' injuries. We express no opinion as to whether the "choice of evils" defense was appropriate under these circumstances.

**9.** The speed limit at Ala Moana Boulevard is thirty-five miles per hour. Although the taxi driver was available, the State did not call him to testify.

**10.** The expert also opined that the taxi driver could have stopped short of the intersection and of hitting the Mustang.

## A.

■ Initially, Defendant contends that he could not have been "involved in an accident resulting in death" because he was "not the driver of a vehicle which struck a pedestrian." Defendant is incorrect.

The pertinent statute, HRS § 291C–12(a) [11] states in relevant part:

The driver of any vehicle involved in an accident resulting in injury to or death of any person shall immediately stop the vehicle at the scene of the accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until the driver has fulfilled the requirements of section 291C–14.[12]

The instruction given by the circuit court on the element of causation in Count II, the negligent homicide count, required the jury to find that Defendant caused or was a concurrent cause of the death of the pedestrian beyond a reasonable doubt.[13] Under the Hawai'i Penal Code, HRS Title 37 (1985), "[c]onduct is the cause of a result when it is an antecedent but for which the result in question would not have occurred." HRS § 702–214 (1985).

■ On the other hand, Count I called for proof beyond a reasonable doubt that Defendant was "involved in an accident resulting in death." Count I, then, did not necessitate proof that "but for" Defendant's conduct, the death would not have been caused, but only

proof that the vehicle Defendant was driving was a "vehicle involved in an accident [which] result[ed] in injury ... or death." HRS § 291C–12(a). On its face, the statute's express language does not mandate that the defendant driver or his vehicle "cause" the accident or "cause" injury or death, to be considered "involved" in the requisite accident. Accordingly, criminal liability under HRS § 291C–12(a) does not require proof that the driver of a vehicle caused injury to or death of a person, but only that the accident the driver was involved in resulted in injury to or death of any person.

Supporting decisions under similarly worded statutes have held that, for the purpose of determining whether a defendant was "involved in an accident," it is not necessary to decide "whether [the] defendant caused or was at fault for the accident", *People v. Kerger*, 191 Ill.App.3d 405, 410–11, 138 Ill.Dec. 806, 809, 548 N.E.2d 36, 39 (1989), and "[o]ne can be involved ... in an accident without being its legal cause." *People v. Bammes*, 265 Cal.App.2d 626, 631, 71 Cal.Rptr. 415, 419 (1968). So, "[w]hile the phrase 'involved in an accident' certainly includes [a] 'collision,' it is not exclusively limited to that term." *Rivas v. State*, 787 S.W.2d 113, 115 (Tex.Ct.App.1990).

Consequently, the jury could have reasonably believed that the evidence was insufficient to prove Defendant caused or was a concurring cause of the pedestrian's death, but could have found there was proof beyond

11. This section was amended by Act 243 § 4, S.B. No. 576, 16th Leg., 1992 Haw.Sess.Laws 642–43 to apply only in accidents "resulting in serious bodily injury or death" and to make its violation a class B felony. HRS § 291C–12.5 was added to apply to "accident[s] resulting in substantial bodily injury[,]" its violation a class C felony, while HRS § 291C–12.6 was added to apply to "accident[s] resulting in bodily injury[,]" a misdemeanor. Act 243 §§ 1 to 2, S.B. No. 576 16th Leg., 1992 Haw.Sess.Laws 642. The purpose of the amendments was to provide "grades of offenses in failure to render aid cases based on the severity of the injury involved." Hse. Stand.Comm.Rep. No. 1008, in 1992 House Journal, at 1276. *See* Hse.Stand.Comm.Rep. No. 1178, in 1992 House Journal, at 1346; Hse. Conf.Comm.Rep. No. 51, in 1992 House Journal, at 813; Sen.Stand.Comm.Rep. No. 1941, in 1992 Senate Journal, at 937–38; Sen.Conf.Comm.Rep. No. 51, in 1992 Senate Journal, at 753.

12. HRS § 291C–14(a) (1985) requires "[t]he driver of any vehicle involved in an accident resulting in injury to or death of any person or damage to any vehicle ... [to] give the driver's name, address, and the registration number of the vehicle ... and ... exhibit the driver's license or permit to drive[.]" This section also requires the driver to "render to any person injured in the accident reasonable assistance[.]"

13. In instructing the jury on negligent homicide, the court stated that "it [was] not necessary that [the jury] find that [Defendant's] negligence was the sole cause of the victim's death[,]" but that it might "properly consider" that "any negligence on the part of the Defendant was a concurring cause of the death of the victim." Our reference to the instruction does not indicate approval or disapproval of the instruction.

a reasonable doubt that the collision with the taxi involved him in an accident which resulted in injury to or death of the pedestrian.

However, Defendant's argument does raise the issue of the scope of the phrase "involved in an accident" in HRS § 291C–12. The statutory language is broad, hinging criminal liability for failing to give information and to render aid on involvement in the incident.

■ The term "involved" is not statutorily defined. "[O]rdinary meanings are attached to terms not given a statutory definition. Resort to legal or other well accepted dictionaries is one way to determine the ordinary meanings of certain terms." *Rivas,* 787 S.W.2d at 115 (citation omitted). *Accord Wylie v. State,* 797 P.2d 651, 657 (Alaska Ct.App.1990). "Involved" can be commonly understood to include the status of "being affected or implicated." *Merriam–Webster's Collegiate Dictionary* 617 (10th ed.1993). Accordingly, we hold that under HRS 291C–12(a), a driver is "involved in an accident" when his or her vehicle is affected or implicated in the accident. *See also Wylie,* 797 P.2d at 657 (" '[i]nvolved' means 'to relate closely' " (quoting *Webster's Third New International Dictionary of the English Language* 1191 (Unabridged 1966))); *Rivas,* 787 S.W.2d at 115–16 (" 'involve[d]' " means " '[t]o relate closely' or '[t]o have an effect on.' " (quoting *Webster's New Collegiate Dictionary* 637 (9th ed.1985))). *Compare Kerger,* 191 Ill.App.3d at 410, 138 Ill.Dec. at 809, 548 N.E.2d at 39 (" 'involved in an accident' " means " 'implicated in an accident or connected with the accident in a substantial manner' " (quoting 1979 Ill.Att'y Gen.Op. 57, 59)); *Bammes,* 265 Cal.App.2d at 631, 71 Cal.Rptr. at 418–19 (" 'involved' " means " 'being connected with (an accident) in a natural or logical manner' " (quoting *People v. Sell,* 96 Cal.App.2d 521, 523, 215 P.2d 771, 772 (1950))).

This common understanding of the term "involved" is consistent with the apparent intent of the drafters of HRS § 291C–12(a). Prior to 1971, the statute's predecessor was much narrower in scope, requiring only those drivers who had actually struck a person or a vehicle to stop and render aid. The prior statute stated:

Whenever any vehicle strikes any person, or collides with any second vehicle containing a person, the driver . . . shall immediately cause the vehicle to stop and shall forthwith render to the person struck, or to the occupant of the second vehicle, all needed assistance. . . .

HRS § 291–2 (1968) *repealed by* 1971 Haw. Sess.L. Act 150, § 3 at 347. Repeal of this statute was part of the legislature's effort to "provide some uniformity in traffic regulation in the State." Hse.Stand.Comm.Rep. No. 157, in 1971 House Journal, at 742; Sen. Conf.Comm.Rep. No. 685, in 1971 Senate Journal, at 1102.

The legislature found that "[m]ost traffic regulation . . . is dealt with by comprehensive traffic ordinances enacted by the several counties . . . [which] contain many provisions which are similar to the provisions of the Uniform Vehicle Code[.]" *Id.* It therefore adopted a statewide code in "conformance with the Federal Highway Safety Program Standard on Codes and Laws." *Id.*

HRS § 291C–12(a) is verbatim section 10–102(a) of the Uniform Vehicle Code (Code). Referring to the predecessor statute, HRS § 291–2, and to three other state statutes like it, the Code pointed out that they "require stops only by drivers whose vehicles actually collide with other vehicles or persons, while the Code requires such stops by any driver 'involved' in an accident even though there is no collision or striking of another vehicle or person." *Uniform Vehicle Code Annotated* § 10–102(a) at 25 (1967).

■ The expansive reach of Code § 10–102(a) and, thus, HRS § 291C–12(a) is evident. The purpose of statutes like HRS § 291C–12(a) which require drivers involved in an accident to stop at the scene of the accident, is "to protect those injured . . . and [to] facilitate a determination of civil and criminal liability." *Wylie,* 797 P.2d at 657. *See also State v. Liuafi,* 1 Haw.App. 625, 643, 623 P.2d 1271, 1282 (1981) ("duty to render aid is clearly intended to furnish accident victims prompt assistance in order to minimize their injuries").

Here, there was a collision between the taxi and Defendant's vehicle, an unplanned and unexpected event well within the scope of the term "involved" as contemplated by the Code. It would be premature at this point to forecast factual situations encompassed within the term "involved" when there is "no collision or striking of another vehicle or person." *Uniform Vehicle Code Annotated* § 10–102(a) at 25 (1967). In connection with the words "involved in an accident" under HRS § 291C–12(a), "[a]ny future cases requiring interpretation of this language must necessarily depend upon the particular facts of the case in light of the purpose behind the statute." *Kerger,* 191 Ill.App.3d at 410, 138 Ill.Dec. at 609, 548 N.E.2d at 39. But the Code's comment signifies a clear intent to broadly apply the duty to stop, give information, and render aid at accident scenes. Because of that, Defendant's argument fails under the version of the statute, HRS § 291C–12(a), in effect at the time of the accident.

## B.

Defendant also contends that "the taxi driver was the driver of a vehicle involved in an accident resulting in [death]" and that the taxi was "involved in a separate accident with [Defendant's] vehicle." Obviously, the significance of Defendant's theory of two accidents rather than one accident is to establish that Defendant's collision with the taxi was not related to the impact between the taxi and the pedestrian. That theory is intended to raise a reasonable doubt as to Defendant's guilt under Count I. An evaluation of that theory required a weighing of the evidence concerning the relationship of the impact between the Mustang and the taxi, and thereafter the taxi and the pedestrian.

In that regard, the jury had the benefit of the eyewitness' and Defendant's testimony, and Defendant's "accident reconstruction" expert's testimony. While Defendant espoused a two-accident theory, we note that Defendant's "accident reconstruction" expert did not render any opinion indicating that there were two accidents.

"[I]ssues going to reasonable doubt ... [are] generally [ ] matter[s] for the fact finder to determine." *State v. Gabrillo,* —— Haw. ——, ——, 877 P.2d 891, 895 (App. 1994). For it was within the jury's province to accept or reject part or all of the witnesses' testimony and an appellate court " 'will not attempt to reconcile conflicting evidence, [or] ... interfere with a jury decision based on the credibility of witnesses or the weight of the evidence.' " *Id.* at ——, 877 P.2d at 895 (quoting *State v. Kekaualua,* 50 Haw. 130, 133, 433 P.2d 131, 133 (1967) (Levinson, J. concurring)). We are required to give " 'full play to the right of the factfinder [sic] to ... weigh the evidence, and draw justifiable inferences of fact.' " *Id.* at ——, 877 P.2d at 894 (quoting *State v. Smith,* 59 Haw. 456, 460, 583 P.2d 337, 341 (1978)). Doing so, we find that there was evidence of a close proximity of time, place and events which would enable a reasonable fact finder to conclude beyond a reasonable doubt that there was one accident, and that that accident resulted in the pedestrian's death.

## C.

Finally, contrary to Defendant's assertion, it is not inconsistent that the jury found Defendant not guilty of negligent homicide in the third degree, a simple negligence crime (Count II), but guilty of intentionally, knowingly, or recklessly failing to stop at the accident scene (Count I). Defendant relies on *State v. Liuafi,* 1 Haw.App. 625, 623 P.2d 1271 (1981) in support of his argument that where inconsistent verdicts exist, the appellate court may affirm one and reverse the other. *Liuafi* held that a defendant "could not be convicted of both attempted murder and of violat[ing] HRS § 291C–12." *Id.* at 643, 623 P.2d at 1282 (footnote omitted). This holding was based on the court's finding that the word "accident" used in HRS § 291C–12 "taken in its usual sense," does not include "[a]n intentional attempt to murder a person by using one's vehicle as a weapon[.]" *Id. Liuafi* is not applicable because the verdicts here were not inconsistent.

Again, while the jury may have believed that the evidence was insufficient to find Defendant guilty of causing the pedestrian's

death, it could have reasonably found that Defendant intentionally, knowingly, or recklessly failed to stop at the scene after the accident occurred.

### D.

■ We hold, then, that plain error was not committed by the trial court in denying Defendant's motion upon the arguments presented. Also, our holding is with prejudice to any HRPP Rule 40 petition based on the untimely filing of the motion. *See Reed,* 77 Hawai'i at 86, 881 P.2d at 1232. We turn, then, to the issue of whether there was substantial evidence to sustain the conviction.[14]

### II.

■ As we stated before:

We are required to sustain the conviction "so long as there is substantial evidence [tending] to support the requisite finding[s] for [the] conviction." *State v. Matias,* 74 Haw. 197, 207, 840 P.2d 374, 379 (1992) (quoting *State v. Ildefonso,* 72 Haw. 573, 576–77, 827 P.2d 648, 651 (1992) (quoting *State v. Tamura,* 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981))). Thus, "[i]t matters not if a conviction ... might be deemed to be against the weight of the evidence...." *Id.* Indeed, "on appeal ... [we do not determine] whether guilt is established beyond a reasonable doubt...." *State v. Cummings,* 49 Haw. 522, 533, 423 P.2d 438, 445 (1967). For, the test on appeal is "whether there [is] substantial evidence to support the conclusion of the trier of fact." *Id.*

.      .      .      .      .

Necessarily then, our search of the record is for the existence of evidence deemed "substantial"; that is, "evidence which a reasonable mind might accept as adequate to support [the] conclusion[ ]" of the fact finder. *State v. Lima,* 64 Haw. 470, 475, 643 P.2d 536, 539 (1982) (quoting *State v. Naeole,* 62 Haw. 563, 565, 617 P.2d 820, 823 (1980)). In such a search, the "evi-

dence" must be considered "in its strongest light for the State." *State v. Tamanaha,* 46 Haw. 245, 251, 377 P.2d 688, 692 (1962) (citations omitted), *reh'g denied,* 46 Haw. 345, 379 P.2d 592 (1963). If there is substantial evidence which supports the fact finder's conclusion, affirmance is required; conversely, the absence of such substantial evidence requires reversal of the conviction.

*Gabrillo,* —— Haw. at ——, 877 P.2d at 896 (citations and footnote omitted). *See also State v. Silva,* 75 Haw. 419, 432, 864 P.2d 583, 589–90 (1993).

■ As discussed in Part I, *supra,* the parties stipulated that Defendant was the driver of a vehicle that collided with the taxi, and that the taxi struck a pedestrian, causing her death. Defendant knew he collided with another vehicle and did not remain at the accident scene, but left the area. In addition, eyewitness Kumuhone saw the collision between Defendant's vehicle and the taxi, Defendant and his passengers looking at the taxi, the legs of a pedestrian extending out from beneath the taxi, and Defendant driving off after stopping for about fifteen seconds. As a result, we find in the record, " 'evidence which a reasonable mind might accept as adequate' " to support the jury's guilty verdict. *Id.,* —— Haw. at ——, 877 P.2d at 896 (quoting *Lima,* 64 Haw. at 475, 643 P.2d at 536).

### III.

For the foregoing reasons, the Judgment of conviction filed on July 31, 1992, is affirmed.

## MOTION FOR RECONSIDERATION AND ORDER GRANTING IN PART AND DENYING IN PART AND MODIFYING OPINION IN PART

Lian–Wen Chen (Defendant) filed a motion for reconsideration of our October 25, 1994 opinion on November 2, 1994. Defense counsel argues that there was no ineffective assistance of counsel because Defendant's motion

---

**14.** Because Defendant appealed directly from the judgment of conviction, the failure to timely file his motion for judgment of acquittal does not preclude us from determining whether his con-

viction was supported by substantial evidence in the record. *State v. Reed,* 77 Hawai'i at 81, n. 17, 81–82, 881 P.2d at 1227, n. 17, 1227–28.

for judgment of acquittal (motion) was deposited with the clerk of the circuit court judge but not filed within the time allowed under Hawaiʻi Rules of Penal Procedure (HRPP) Rule 29(c). Defense counsel also contends that this court should have held oral argument on the timeliness of the motion. Finally, defense counsel essentially reiterates the points in her briefs on appeal.

Based on the record on appeal, the motion was not "made or renewed" within the 10-day period required by HRPP Rule 29(c). Defense counsel contends, however, that she submitted the motion within the 10-day period to the trial court's chambers, in accordance with an informal procedure followed in the circuit court. Defense counsel represents that under this procedure, a motion "must first be submitted to the Judge's chambers for review and scheduling of a hearing date" before it can be filed. She states that the motion would not have been accepted for filing unless it was initialed by the judge's clerk and was assigned a hearing date.

Whatever the procedure was, the parties and the court were still obligated to insure that the record properly reflected the facts represented, or that the procedure allowed for filing within the time set forth in the rules, or that the motion was timely filed under whatever procedure was adopted by the court. The filing date on the document is the only reference available to the appellate court and we presume that the motion was "made or renewed" on the date filed, there being nothing else indicated in the record.

While no oral argument was held in this case, the October 12, 1994 order, determining that oral argument was not necessary, expressly afforded counsel the opportunity to "file a motion for retention of oral argument," but none was filed. The untimeliness of the motion was clearly reflected in the record and defense counsel, for whatever reason, chose not to address it.

However, we agree, that under the particular circumstances of this case, the procedure followed by the circuit court was not directly controlled by Defendant's counsel. We, therefore, grant the motion to reconsider that part of the opinion related to ineffective assistance of counsel and modify our opinion to hold that there was no ineffective assistance of counsel.

Although we hold that there was no ineffective assistance of counsel, our affirmance is not affected. Our original opinion had proceeded on the merits of the appeal without regard to the ineffective assistance issue. Based on what was submitted in the motion for reconsideration, we see no reason for amending the opinion as it relates to the merits of the case itself. Accordingly, the motion for reconsideration is denied as to the merits of the appeal.